Filed 8/15/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B291127 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA110348) |
| v. | |
| SANDRA SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge. Affirmed in part and remanded with directions.

Randy S. Kravis for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

A 33-year-old woman French kissed, groped, and kissed the breasts of a female family member a little before and after the girl's 14th birthday.  A jury convicted the woman of committing lewd and lascivious acts (Pen. Code, § 288),[1] and the trial court placed her on probation with an eight-year prison sentence hanging over her head.  Among the challenges the woman raises to her conviction and sentence in this appeal, two entail issues of significance:  (1) is "intent to *sexually exploit*" the minor a second intent element of the crime of committing lewd and lascivious acts against a minor, and (2) is it error for a trial court, when imposing a prison sentence but staying its execution, to impose but stay a probation revocation restitution fine (under section 1202.44) *and* a parole revocation restitution fine (under section 1202.45)?  We conclude that the answer to each question is "no." Because the woman's remaining arguments on appeal also lack merit, we affirm but remand with directions.

### FACTS AND PROCEDURAL BACKGROUND

**I.    Facts**

Sandra Sanchez (defendant) is now a 37 year old gay woman.  Y is now a 17 year old gay female.  Defendant is Y's step-grandfather's niece.

**A.    *Initial incident***

On November 2, 2014, defendant was 33 years old and Y, then an "8th grade[r]," was 13.

Following a family gathering, defendant and Y went up to Y's bedroom to talk.  By 3 a.m., they were alone, lying on Y's bed and talking.  Y then turned to defendant, and gave her an open-mouthed kiss (a so-called "French kiss").  Although defendant

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

thereafter turned away and told Y she was "sorry," defendant went on to French kiss Y seven or eight more times; defendant herself initiated one of those kisses. Y described the kisses as "emotional" and "passionate."

**B.** *Budding relationship*

Over the next three months, defendant and Y exchanged as many as 50 messages a day on a number of different platforms, including Instagram, Snapchat, Kik and regular text messaging. Amidst those messages, defendant asked Y what the "first thing" that Y "check[s] out in a girl." Defendant also told Y, "I miss you a lot, I need you, and I adore you." Defendant dedicated songs to Y, including songs with lyrics involving "love" and "lust." Defendant and Y also exchanged gifts: Defendant gave Y a few bracelets, and Y gave defendant a necklace and a sweater.

Approximately two weeks after the initial incident, Y's mother caught Y trying to hide her phone, took the phone away and saw some of the romantic messages. When Y's mother called the phone number associated with the messages, defendant answered. Recognizing defendant's voice, Y's mother told defendant to stay away from her daughter.

Ignoring Y's mother, defendant and Y met up on New Year's Day near the Rose Parade in Pasadena, California. While there, they held hands, hugged, and French kissed. Y asked defendant to be her "girlfriend." Defendant said, "Yes." This mutual expression of affection and dedication was followed by more hugging and kissing.

When Y's mother went looking for Y on New Year's Day and found her with defendant, Y's mother "went off" on defendant, told her for a second time to stay away from Y, and took Y's phone away from Y.

3

## C.   *Midnight rendezvous*

The night of January 31, 2015—the night before the Super Bowl—defendant and Y, who had turned 14 years old, arranged to meet up in an alleyway near Y's grandmother's house. Y asked defendant to wear a shirt that accentuated her cleavage. Y snuck out of the house around midnight. While in the alley, defendant and Y hugged and French kissed. They also cupped one another's breasts, and moaned in response to one another's caresses. Defendant then kissed Y's bare breast, and left a "hickey." They stopped after about 20 minutes because Y's cousin came looking for Y.

## D.   *The end of the relationship*

On Super Bowl Sunday, Y's mother saw a photograph of Y's breast with the hickey on it (which Y had taken and sent to defendant). Y's mother texted defendant, calling her "nothing but a pedophile" and telling her—for the third time—to leave Y alone.

A few days later, one of Y's teachers noticed Y was upset and asked her what was wrong. When Y mentioned that she was in a "relationship" with an older woman, the teacher reported the matter to the vice principal, who then reported the matter to police.

## II.   Procedural Background

### A.   *The charges*

The People charged defendant (1) with committing a lewd and lascivious act with a minor under the age of 14 (§ 288, subd. (a)) for the initial incident; (2) with misdemeanor child molestation (§ 647.6, subd. (a)(1)) for the interactions following the initial incident and preceding the midnight rendezvous; and (3) with committing a lewd and lascivious act with a minor 14 years or older (§ 288, subd. (c)(1)) for the midnight rendezvous.

4

**B.** *Trial*

The matter proceeded to a jury trial.

Defendant called several witnesses in her defense.

She took the stand herself, testifying that she would "never refuse to do anything [Y] wanted" because she "wanted to be there for" Y and to "support" Y for being a young gay woman and because she was "afraid that [Y] would do . . . horrible things" without that support. Defendant admitted that she had lied to police when she said her only physical contact with Y was a single, closed-lipped kiss on November 2, 2014. Defendant also never told police that she felt Y might harm herself.

Defendant called a forensic psychologist to offer the expert opinion that defendant had no "abnormal interest in sex with minors." Instead, the expert opined, defendant was a "giver" who had just "kind of got caught up in . . . a very sensitive situation" and who ended up exercising "poor judgment." The expert acknowledged that she had never read the text messages between defendant and Y, and that defendant had lied to the expert about the extent of physical contact with Y.

Defendant also called her current, 37-year-old girlfriend and her sister, each of whom opined or relayed defendant's reputation for only engaging in normal sexual behavior. However, each witness conceded that her opinion might change if the charges in this case were true.

A jury found defendant guilty of all charges.

**C.** *Sentencing*

The trial court sentenced defendant to prison for eight years, reflecting the upper term for committing a lewd and lascivious act upon a minor under 14 years of age. The court imposed a concurrent three year prison sentence for the other

5

lewd and lascivious act count.  The court then suspended execution of both sentences and placed defendant on five years of formal probation.  On the misdemeanor child molestation count, the court placed defendant on formal probation for five years and imposed 364 days in the county jail.

As pertinent here, the court as conditions of probation required defendant to (1) "keep [the] Probation [Office] advised of her residency at all times" and (2) "seek and maintain training, schooling, or employment as approved by Probation."  The court also imposed a $300 restitution fine, a $300 probation revocation restitution fine, and a $300 parole revocation restitution fine; the court suspended the latter two fines.

### D.   *Appeal*

Defendant filed this timely appeal.

## DISCUSSION

## I.   Ineffective Assistance of Counsel / Elements of Section 288

Defendant argues that her attorney provided constitutionally ineffective assistance by not objecting to the prosecutor's closing argument.  We independently review such claims.  (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

### A.   *Pertinent facts*

#### 1.   *Defense closing argument*

In her closing argument, defendant argued that her innocence of the charges was "obvious," and that the People's position that she was guilty "boggles the mind" and was "crazy," "ridiculous," "inconceivable," "bizarre," and "just nuts." Defendant urged that she was not "sexually exploiting" Y. Instead, she was merely "helping" and "support[ing]" Y by allowing Y to "explor[e] [her] sexuality with someone she's comfortable with."  "Two gay women" "getting together,"

6

defendant reasoned, was an "entirely different situation" from a "30-year-old man attacking a teenage girl." If anything, defendant implored, defendant's willingness to go "all in" to help Y meant there was "no [improper] motivation on defendant's part."

### 2. *Prosecutor's rebuttal argument*

In rebuttal, the prosecutor argued that defendant was incorrect in suggesting that intent to exploit was a separate element to the crimes of lewd and lascivious conduct. The pertinent element, the prosecutor went on to explain, was whether defendant acted "with the intent of arousing, appealing to, or gratifying the lusts, passions, or sexual desires [of herself or] of the child."

### B. *Analysis*

Defendant argues that her counsel provided ineffective assistance because he did not object to the prosecutor's rebuttal argument, which she claims amounted to prosecutorial misconduct.

A defense attorney is constitutionally ineffective only if (1) the attorney's "performance was deficient" because it "'''''fell below an objective standard of reasonableness . . . under prevailing professional norms,'''''" and (2) "but for counsel's deficient performance," it is "reasonabl[y] probab[le]" that "the outcome of the proceeding would have been different." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, quoting *People v. Lopez* (2008) 42 Cal.4th 960, 966.) Because it is well settled that the decision to forego a meritless objection does not amount to deficient performance (*People v. Lucero* (2000) 23 Cal.4th 692, 732), defendant's claim of ineffective assistance turns on whether the prosecutor did, in fact, engage in misconduct to which an

7

objection would have been meritorious.  A prosecutor commits misconduct that violates due process under federal and California law if, respectively, the conduct "'"'"infects the trial with such unfairness as to make the conviction a denial of due process"'"'"' (*People v. Adams* (2014) 60 Cal.4th 541, 568) or the conduct "'"'"involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury"'"'"' (*ibid.*).  As pertinent here, a prosecutor commits misconduct if he or she "'misstate[s] the law.'"  (*People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*).)

Because the prosecutor's rebuttal argument acknowledged the People's burden of proving that defendant acted with the "intent of arousing, appealing to, or gratifying the lusts, passions, or sexual desires [of herself or] of the child" and disclaimed only the need to prove a further "intent to exploit," defendant's ineffective assistance claim accordingly tees up the following question:  Does the crime of committing lewd and lascivious acts with a minor have *two* intent elements or just one?  This is a question of statutory interpretation that we review de novo.  (*People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 234 (*Sahlolbei*).)

We conclude that the answer is just one, and that element requires the People to prove the defendant's intent to arouse, appeal to or gratify the lust, passions or sexual desires of herself or the child.  Put differently, there is no separate intent to sexually exploit the minor element.

The plain text of section 288 so dictates.  In pertinent part, section 288 makes it a crime for a person to "willfully and lewdly commit[] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child . . . with the intent of

8

arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." (§ 288, subd. (a).)[2] The text says nothing about a further "intent to exploit." Where, as here, the plain text is unambiguous, it is controlling. (*J.M. v. Huntington Beach Union High School Dist.* (2017) 2 Cal.5th 648, 654 ["'If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls.' [Citation.]"].) Not surprisingly, the standard CALCRIM jury instructions for section 288 and other cases interpreting section 288 also list only one intent element. (CALCRIM Nos. 1110, 1112; *People v. Levesque* (1995) 35 Cal.App.4th 530, 541.)

To be sure, section 288 was enacted to "provide children with 'special protection' from sexual exploitation," and our Supreme Court has remarked that the "'gist' of the [lewd and lascivious act] offense has always been the defendant's intent to sexually exploit a child, not the nature of the offending act." (*People v. Martinez* (1995) 11 Cal.4th 434, 443-444.) But, contrary to what defendant urges, neither the purpose of section 288 nor our Supreme Court's remarks translate into a second "intent to exploit" element. That is because the exploitation that section 288 was enacted to condemn and that forms the "gist" of the offense is the "profound harm" that "young victims suffer" "whenever they are perceived and used as objects of sexual desire," a harm to which they are "'uniquely susceptible'" "as a result of their dependence upon adults, smaller size and relative

---

**2** The sole difference between the two subdivisions of section 288 separately charged in this case concerns the age of the minor, not the intent element. (Compare § 288, subd. (a) with § 288, subd. (c)(1).)

9

naiveté." (*Martinez*, at p. 444; *People v. Scott* (1994) 9 Cal.4th 331, 341-342; *People v. Shockley* (2013) 58 Cal.4th 400, 404; see also, *People v. Soto* (2011) 51 Cal.4th 229, 243 [the "wrong punished by the lewd acts statute is" the adult defendant's destruction of the minor's "sexual innocence"], italics omitted.) Section 288 prohibits the sexual exploitation of children by prohibiting lewd and lascivious acts committed "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] or the child." (§ 288, subd. (a).) This is the intent requirement *Martinez* referenced when it said that the "gist" of section 288 was the "intent to sexually exploit a child."

Defendant offers what boil down to three further arguments in support of her position that the prosecutor's disclaimer of a separate "intent to exploit" element misstated the law and thereby committed prosecutorial misconduct.

First, she maintains that section 288 has a separate "intent to exploit" requirement that, in effect, requires proof of a defendant's (1) intent to arouse, appeal to, or gratify the lust, passions or sexual desires of herself or a victim-child, *and* (2) nefarious (that is, non-innocent) motive for committing the crime. We reject this argument. Not only is it inconsistent with the analysis of section 288's text and purpose set forth above, but it also conflates a defendant's *motive* with her *intent*. They are not the same: Motive is the "'reason a person chooses to commit a crime,'" and is "'different from a required mental state such as intent . . .'" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1123, quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) That defendant in this case claimed to have had an altruistic motive for touching Y in a manner that whet Y's and her own sexual

10

appetites does not exonerate her from the criminal liability attaching to that conduct. This argument is also inconsistent with defendant's conduct below, given that she did not object to the standard CALCRIM jury instruction that contained only a single intent element.

Second, defendant asserts that *In re Jerry M.* (1997) 59 Cal.App.4th 289 supports her position that there is a separate "intent to exploit" argument. We reject this argument. *In re Jerry M.* held that there was insufficient evidence that an 11-year-old defendant who had groped the breasts of several 12-13-year-old girls had the requisite "intent to arous[e], appeal[] to, or gratify[] the lust, passions, or sexual desires" because there was "no evidence he had reached puberty," and thus no evidence that he even understood what "lust, passions, or sexual desires" were. (*Id.* at pp. 299-300.) *In re Jerry M.* is thus doubly unhelpful to defendant: It applied the very intent requirement found in section 288's text, and *Jerry M.* applied that intent requirement to a prepubescent boy—not an adult woman who not only understood sexual conduct but kissed and groped Y until Y was moaning.

Lastly, defendant urges that even if there is no second "intent to exploit" element, the prosecutor's disclaimer of such an element during his rebuttal argument effectively told the jury there was no intent requirement *at all*. We reject this argument. In evaluating whether a prosecutor has committed misconduct during closing argument, we examine the challenged argument ""'[i]n the context of the whole argument and the instructions," [citation],'" and ask whether "'there was a "reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*Cortez*, *supra*, 63 Cal.4th at p.

130.)  Here, the prosecutor's comment that there was no "intent to exploit" element was followed by his reaffirmation of an "intent to arouse, appeal or, or gratify the lust" element and his explanation of why the evidence in this case overwhelmingly established that defendant had such an intent.  On this record, there is no "reasonable likelihood" the jury threw out the baby with the bathwater and construed the prosecutor's argument as disclaiming *any* intent requirement.

## II.    Sentencing Issues

### A.    *Probation conditions*

Defendant challenges two of the conditions of probation imposed in this case.  A condition of probation is presumptively valid unless it (1) "'has no relationship to the crime of which the offender was convicted,'" (2) "'relates to conduct which is not in itself criminal,'" *and* (3) "'requires or forbids conduct which is not reasonably related to future criminality.'"  (*People v. Lent* (1975) 15 Cal.3d 481, 486, superseded by statute on another ground as stated in *People v. Moran* (2016) 1 Cal.5th 398, 403, fn. 6.)  If a condition "imposes limitations on a person's constitutional rights," the trial court must also "closely tailor those limitations to the purpose of the condition."  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)  We review the validity of a probation condition for an abuse of discretion (*People v. Olguin* (2008) 45 Cal.4th 375, 379), but the constitutionality of such a condition de novo (*People v. Appleton* (2016) 245 Cal.App.4th 717, 723).

### 1.    *Keeping probation office "advised" of her residency*

Defendant argues that the trial court abused its discretion in imposing a condition that required her to "[m]aintain residence *as approved by* the Probation Officer" because granting a Probation Office the power to dictate where she lives is unlawful.

12

(Italics added.) We need not confront defendant's challenge because the "approv[al]" language appears only in the trial court's minute order listing the conditions of probation. Orally, the court required defendant to "keep [the] Probation [Office] *advised* of her residency at all times." (Italics added.) Because, as the People concede, the oral pronouncement of sentence controls over a subsequently entered minute order (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 ["The record of the oral pronouncement of the court controls over the clerk's minute order."]; *In re D.H.* (2016) 4 Cal.App.5th 722, 724-725 [applying this principle to probation conditions]), the residency condition actually imposed in this case does not suffer from the defect defendant decries.

   2.   *Seeking and maintaining employment*

Defendant next argues that the trial court abused its discretion and overstepped its constitutional bounds by requiring her, as a condition of probation, to "seek and maintain training, schooling, or employment as approved by [the] Probation [Officer]" because that condition does not expressly account for the possibility that she might not able to stay in school or remain employed due to factors beyond her control.

We find no infirmity with this condition of probation. Section 1203.1 specifically authorizes a trial court to "require as a condition of probation that the probationer go to work and earn money . . ." (§ 1203.1, subd. (d).) Not surprisingly, "[a]n order that a criminal defendant seek and maintain gainful employment as a condition of probation is one commonly imposed." (*People v. Hodgkin* (1987) 194 Cal.App.3d 795, 808 (*Hodgkin*); see also *People v. Lewis* (1978) 77 Cal.App.3d 455, 464.) The same is true of conditions requiring a probationer to remain in school and

13

"maintain satisfactory grades." (*In re Angel J.* (1992) 9 Cal.App.4th 1096, 1100-1101.)

Although defendant's ability to "maintain" "training, schooling or employment" may not be entirely within her control, any non-compliance with these requirements due to "circumstances beyond . . . her control" cannot give rise to a probation violation. (*People v. Cervantes* (2009) 175 Cal.App.4th 291, 295.) That is because courts routinely imply a "willfulness" requirement into conditions of probation. (*Id.*; *People v. Hall* (2017) 2 Cal.5th 494, 502.) However, the possibility of non-compliance due to circumstances beyond a probationer's control precludes the *imposition of the condition of probation in the first place* only where the trial "court can say as a matter of law [that] compliance would be impossible." (*Hodgkin, supra*, 194 Cal.App.3d at p. 811.) Here, there was no such showing; indeed, defendant's prior employment constitutes substantial evidence that her compliance is not impossible.

**B.** ***Probation and parole revocation restitution fines***

Defendant argues that the trial court erred in imposing but staying *both* a probation revocation restitution fine *and* a parole revocation restitution fine. The propriety of imposing these fines turns on a question of statutory interpretation, which we independently review. (*Sahlolbei, supra*, 3 Cal.5th at p. 234.)

Whenever a court "impose[s]" "a sentence that includes a period of probation," it must "assess" a probation revocation restitution fine that is suspended unless and until probation is revoked. (§ 1202.44.) Whenever a court imposes a "sentence [that] includes a period of parole," the court must "assess" a parole revocation restitution fine that is suspended unless and until parole is revoked. (§ 1202.45, subds. (a) & (c).) The parole

14

revocation restitution fine must also be imposed "at the time" the court "impose[s] the restitution fine" under section 1202.4, subdivision (b).  (*Ibid.*)

Where, as here, the trial court imposes a prison sentence but suspends execution of that sentence in order to place the defendant on probation, should the court at the time of pronouncing this sentence (1) impose (and suspend) *only* the probation revocation restitution fine, or (2) impose (and suspend) *both* the probation revocation restitution fine *and* parole revocation restitution fine?

The Courts of Appeal have split on this issue.  One court has held that the trial court should impose *only* the probation revocation restitution fine, and may not also impose the parole revocation restitution fine.  (*People v. Hunt* (2013) 213 Cal.App.4th 13, 16-18 (*Hunt*).)  Several other courts have held that the trial court should impose *both* revocation restitution fines.  (*People v. Preston* (2015) 239 Cal.App.4th 415, 429 (*Preston*); *People v. Tye* (2000) 83 Cal.App.4th 1398, 1401-1402.)

We add our voice to the growing chorus of decisions holding that the trial court must impose *both* revocation restitution fines at the time of original sentencing, and we do so for three reasons.

First, the plain text of section 1202.45 so requires.  Section 1202.45 requires that the parole revocation restitution fine be "assess[ed]" (1) whenever a sentence is imposed that "includes a period of parole" and (2) "at the time of imposing the restitution fine."  (§ 1202.45, subd. (a).)  Because "a defendant is 'sentenced' when a judgment imposing punishment is pronounced even if execution of the sentence is then suspended" (*People v. Scott* (2014) 58 Cal.4th 1415, 1423, 1426), and because a prison sentence automatically "include[s] a period of parole supervision"

15

(§ 3000, subd. (a)(1)), a trial court's pronouncement of an imposed-but-stayed prison sentence is a sentence that "includes a period of parole." As such, the parole revocation fine should be "assessed" at that time. (Accord, *People v. Smith* (2001) 24 Cal.4th 849, 853 ["Under section 1202.45, a trial court has *no* choice and *must* impose a parole revocation fine . . . whenever the 'sentence includes a period of parole.'"].) Further, because the "restitution fine" is imposed when the initial sentence is imposed but stayed, the parole revocation restitution fine should also be assessed at the same time. (E.g., *People v. Calabrese* (2002) 101 Cal.App.4th 79, 86.)

Second, the purpose underlying section 1202.45 counsels strongly in favor of mandating the imposition of the parole revocation restitution fine at the time a prison sentence (with the parole "tail") is initially imposed, even if its execution is suspended. As its name suggests, one of the purposes of the parole revocation *restitution* fine is "to provide for compensation of crime victims." (*Preston*, *supra*, 239 Cal.App.4th at p. 429.) That purpose is better served by requiring trial courts to impose but suspend the parole restitution fine at the time a sentence involving parole is initially imposed rather than waiting until a later proceeding at which probation is revoked and the previously suspended prison (and parole) sentence is put into effect. Otherwise, there is a risk that the trial court will forget to impose the fine or, worse yet, a defendant will argue that it is too late to do so (e.g., *People v. Andrade* (2002) 100 Cal.App.4th 351, 353, 357-358 [so arguing] (*Andrade*).)

Lastly, we are not persuaded by the reasons cited by other courts—and, in particular, *Hunt*—for postponing imposition of the parole revocation restitution until the suspended prison-with-

16

parole-tail sentence is put into effect. *Hunt* offered two such reasons. *Hunt* pointed to the absence of any "evidence [that] the Legislature intended" "the parole restitution fine" to be "imposed and stayed" "when probation is granted." (*Hunt, supra*, 213 Cal.App.4th at p. 18.) For the reasons set forth above, the plain text of section 1202.45 unambiguously dictates that the "parole revocation restitution fine" be imposed at the time a prison sentence is initially imposed. "Where," as here, "statutory language is unambiguous, a court is precluded from considering legislative history." (*Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, 755, citing *People v. Robles* (2000) 23 Cal.4th 1106, 1111.) *Hunt* also cited the potential disparate treatment between defendants whose *imposition* of sentence is suspended and those whose *execution* of sentence is suspended. (*Hunt*, at pp. 19-20.) In this regard, *Hunt* reasoned that the defendant in the former situation would be faced with a possible probation revocation restitution fine (because no prison sentence with a parole tail would be imposed), while defendants in the latter situation would be faced with a possible probation *and* parole revocation restitution fines (because, as here, a prison sentence with a parole tail is imposed along with probation). We agree with other courts that have concluded that *Hunt* is incorrect on this point because even a defendant whose imposition of sentence is initially suspended will be ultimately faced with *both* the probation *and* parole revocation restitution fines if his probation is revoked and he is ultimately sentenced to prison; in other words, there is no disparity because all defendants who are sentenced to probation and eventually to prison will be faced with both types of revocation restitution

17

fines. (*Preston, supra,* 239 Cal.App.4th at p. 428; see also, *Andrade, supra,* 100 Cal.App.4th at pp. 353, 357-358.)

## DISPOSITION

The matter is remanded to the trial court with directions to conform the sentencing minute order to the trial court's oral pronouncement of judgment by striking the probation condition requiring defendant to "[m]aintain residence as approved by the probation officer." As modified, the judgment is affirmed.

**CERTIFIED FOR PUBLICATION.**


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

18